# United States Court of Appeals
## For the First Circuit

No. 02-1220

UNITED STATES OF AMERICA,

Appellee,

v.

GABRIEL MORALES-MADERA,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Héctor M. Laffitte, Chief U.S. District Judge]

Before

Lynch, Circuit Judge,
Lipez, Circuit Judge,
Oberdorfer, Senior District Judge*.

Johnny Rivera-Gonzalez for appellant.
Thomas F. Klumper, Assistant United States Attorney, with whom
H.S. Garcia, United States Attorney, and Sonia I. Torres, Assistant
United States Attorney, were on brief, for appellee.

November 20, 2003

---

*Of the United States District Court for the District of
Columbia, sitting by designation.

**LYNCH**, **Circuit Judge**.  In our increasingly pluralistic and multilingual society, the issues raised by this case will grow in importance.  This case arises in the federal courts of Puerto Rico.  These courts often face the difficult task of admitting evidence that originates in the Spanish language while seeking to comply with the Jones Act, 48 U.S.C. § 864, which requires that court proceedings be conducted in English.  In this case, the evidence involved fifty-two recordings of wiretapped conversations in Spanish among members of a drug importation and distribution conspiracy.

The defendant, Gabriel Morales-Madera, was convicted of participating in a massive drug conspiracy.  He was sentenced to 250 months imprisonment and six years of supervised release.  On appeal, the primary issue raised is that English-language transcripts of the wiretapped conversations were neither marked as exhibits nor admitted in evidence, and that the court reporter did not transcribe and translate the wiretapped conversations into the record as the tapes were being played.

Morales-Madera urges this court to adopt a bright-line rule that where English transcripts of taped conversations conducted in Spanish are not admitted in evidence, there is such harm to the national interest in maintaining English as the language of the courts that any ensuing conviction should be overturned.  He reads our opinion in United States v.

-2-

Rivera-Rosario, 300 F.3d 1 (1st Cir. 2002), to require that result. We reject both his reading of Rivera-Rosario and his proposed bright-line rule. Instead, we evaluate a number of factors, taking into account the nature of the problem at trial, the objections made by the defendant below, the use of Fed. R. App. P. 10(e) to supplement the record for purposes of appellate review, and any prejudice to the defendant. Morales-Madera also argues that there was insufficient evidence to convict and that there were sentencing errors. We reject his challenges to his conviction and affirm.

**I.**

Because the jury returned a guilty verdict as to Morales-Madera, we state the facts in the light most favorable to his conviction.

On December 10, 1997, a federal grand jury returned a four-count indictment against twenty-four defendants allegedly involved in a drug trafficking organization. Count One charged that from about December 1994 until the time of the indictment, Morales-Madera and twenty-two other individuals conspired to distribute and to possess with the intent to distribute more than five kilograms of cocaine, one kilogram of heroin, and multi-pound quantities of marijuana, in violation of 21 U.S.C. § 846.

Morales-Madera was tried alone in a four-day jury trial that started on August 6, 2001. At trial, FBI Special Agent Carlos Cases testified that Federico Naranjo-Rosa and his nephew Carlos

Gutierrez-Naranjo operated a drug-trafficking organization. According to Agent Cases's testimony, the organization imported cocaine and heroin from the Dominican Republic and Columbia and distributed marijuana in Puerto Rico. Agent Cases testified that Morales-Madera was Naranjo-Rosa's right-hand man and had the task of collecting drug debts and helping Naranjo-Rosa obtain drugs from the Dominican Republic.

The government played to the jury recordings of fifty-two tapes of telephone conversations between the conspirators that were intercepted and recorded by the FBI pursuant to a wiretap order. These wiretapped conversations took place in Spanish. The court reporter did not transcribe or translate the contents of the tapes in the record. Instead, the government provided Spanish transcripts of the tapes and English translations of those transcripts to the district court, the jury, and defense counsel at trial.[1] The jury used the transcripts as aids while the wiretap tapes were played, and returned the transcripts to the government afterwards. The court instructed the jury to "consider in [their] deliberations what [they] heard on tape, not what the transcript says." The transcripts were not marked as exhibits or entered in evidence, and they were not taken into the jury room during

---

[1] Transcripts were provided for each tape played to the jury except for Exhibit No. 4, which Agent Cases testified was a tape of a conversation on April 5, 1997 between Naranjo-Rosa and co-conspirator Rivera-Rosario regarding two planned shipments of 500 kilograms of cocaine.

deliberations. At trial, defense counsel did not object to the use of the transcripts or to their accuracy.

According to Agent Cases's testimony, most of the wiretaps consisted of conversations using coded language to discuss drug sales and the collection of drug debts. Nine tapes involved wiretapped conversations between Morales-Madera and Naranjo-Rosa in April and May 1997. In one conversation on April 15, Morales-Madera referred in coded language to returning bad drugs in exchange for good drugs. Later that day, Morales-Madera called Naranjo-Rosa to ask how much money he should collect for twenty kilograms of cocaine ("twenty parts"). After consulting with Gutierrez-Naranjo, Naranjo-Rosa called Morales-Madera back to tell him in coded language that the price would be $15,000 per kilogram. On April 18, Naranjo-Rosa and Morales-Madera discussed a $30,000 debt owed to Gutierrez-Naranjo. During the conversation, Naranjo-Rosa became upset because Morales-Madera used non-coded language to discuss the debt, and warned Morales-Madera that his phone might be tapped. On April 29, Naranjo-Rosa told Morales-Madera that they had five-eighths of a kilogram, or 625 grams, of heroin ("five whitewall tires"), for which the two discussed an appropriate price. The two also discussed the collection of debt for cocaine ("parts"). On April 30, Naranjo-Rosa instructed Morales in coded language to call someone who would give him $45,000, and the two discussed cocaine ("tires"). In three conversations on May 1 and

2, the two made plans to purchase heroin ("15 wide whitewall tires") in the Dominican Republic and discussed in coded language $1,000 that was missing from a $39,000 payment.

Another tape involved a phone call on April 11 from Morales-Madera, who was using Naranjo-Rosa's wiretapped phone, to American Airlines to arrange their flight to the Dominican Republic that day. FBI Agent Cases testified, based on other wiretapped conversations, that the purpose of this trip was to purchase heroin to be imported into Puerto Rico.

The government also played tapes of conversations in which Morales-Madera did not participate. Three tapes involved coded discussions by co-conspirators regarding Morales-Madera's activities. On April 15, Naranjo-Rosa and Gutierrez-Naranjo discussed Morales-Madera's call to Naranjo-Rosa earlier that day, in which Morales-Madera had asked how much money he should collect for twenty kilograms of cocaine. Later that same day, Naranjo-Rosa told Gomez-Felix that he would send him money via Morales-Madera. On April 30, Naranjo-Rosa and Gomez-Felix discussed four and one-half eighths of a kilogram of heroin that Naranjo-Rosa and Morales-Madera were supposed to pick up from the Dominican Republic. Approximately thirty other recordings involved coded conversations between co-conspirators about drug importation or distribution.

In addition to the wiretapped conversations, the government introduced passports, boarding passes, and testimony

from Agent Cases about Morales-Madera's travel to the Dominican Republic.  Morales-Madera traveled to the Dominican Republic with Naranjo-Rosa on April 11 and again on April 21.  Morales-Madera also took one trip to the Dominican Republic with Naranjo-Rosa's cousin on May 2.

Morales-Madera testified at trial in his own defense.  In his testimony, he admitted that he had sought to collect debts owed to Gutierrez-Naranjo and that he had assumed at the time that those debts were drug-related.

On August 9, 2001, the jury found Morales-Madera guilty of Count One of the indictment.  On January 22, 2002, Morales-Madera was sentenced to 250 months imprisonment, plus a supervised release term of six years and a special monetary assessment of $100.  Seeking to reverse his conviction and sentence, Morales-Madera filed this appeal.

## II.

### A.  English Language Issue

This issue involves two statutes: (1) the Jones Act, 48 U.S.C. § 864, which provides that "[a]ll pleadings and proceedings in the United States District Court for the District of Puerto Rico shall be conducted in the English language," and (2) the Court Reporter Act, 28 U.S.C. § 753(b), which requires that "all proceedings in criminal cases [held] in open court . . . shall be recorded verbatim."

Morales-Madera's first theory confuses the different statutes and different types of evidence. He argues that the Court Reporter Act required the reporter to transcribe literally and somehow translate into English the wiretap tapes as they were played to the jury. That, in our view, is a misreading of the statute. When the court reporter transcribes the testimony of a witness who testifies in Spanish, the interpreter's English translation is the evidence entered in the record under the Jones Act. United States v. De Jesus Boria, 518 F.2d 368, 370 (1st Cir. 1975); Bordas & Co. v. Pizarro, 314 F.2d 291, 292 (1st Cir. 1963). The playing of recordings, however, presents a different issue. The conversations on the wiretap tapes are not testimony from witnesses before the court that must be recorded in a verbatim transcript.[2]

Language in some opinions, ours and others, indicates that the Court Reporter Act is violated when the court reporter fails to simultaneously transcribe the contents of recordings heard by the jury. See United States v. Andiarena, 823 F.2d 673, 676 (1st Cir. 1987); United States v. McCusker, 936 F.2d 781, 785 (5th Cir. 1981). We harbor considerable doubts about this proposition. The Court Reporter Act is not usually understood to require the

---

[2] Even if the Court Reporter Act were violated because a verbatim transcript was not available, reversal of the conviction would not automatically be required. United States v. Brand, 80 F.3d 560, 563 (1st Cir. 1996).

-8-

reporter to record separately the contents of exhibits admitted in evidence. The tapes of the recordings are not testimony but are themselves admitted in evidence as exhibits. See United States v. Young, 105 F.3d 1, 10 (1st Cir. 1997); United States v. Craig, 573 F.2d 455, 480 (7th Cir. 1977) (finding "no merit" to the argument that there was a violation of the Court Reporter Act because the reporter did not transcribe the recorded conversations). We held in United States v. Rengifo, 789 F.2d 975 (1st Cir. 1986), that a transcript of a composite audio recording was not "testimony" even when the transcript was read aloud to the jury. Id. at 977, 983. At any rate, this issue need not be resolved. Even among those courts that find an error under the Court Reporter Act based on the failure to transcribe an audio recording, it is agreed that the error is harmless when the recording itself is entered in the record. See Andiarena, 823 F.2d at 676; McCusker, 936 F.2d at 785.

Morales-Madera's next argument is a Jones Act claim that implicates several issues. At the trial level, separate issues arise regarding the submission of English transcripts of Spanish audio recordings to the jury as aids, the proper procedures for ensuring reliable transcription of the taped conversations and reliable translation of those transcripts into English, and the admissibility of English transcripts as evidence. At the appellate level, issues arise regarding compliance at the trial court level with the Jones Act and the Court Reporter Act, the adequacy of the

-9-

record on which appellate review is based, and the appropriate remedy for non-compliance.

1.    Submitting English Transcripts to the Jury

When an audio recording is in English, the common practice is to play the recording, make a transcript available, mark the transcript as an exhibit, and use it as an aid.  Our court, and many others, have approved such use of transcripts as aids to the jury, provided the court makes clear to the jury that the tape rather than the transcript constitutes the best evidence. United States v. Ademaj, 170 F.3d 58, 65 (1st Cir. 1999).  In ordinary circumstances, the district court does not abuse its discretion in allowing the jury to use the transcripts during deliberations.  Rengifo, 789 F.2d at 980.

Providing an English-language transcript of wiretap evidence is more than merely useful when the recorded language is not English; for Jones Act purposes, it is necessary.  The language of the federal courts is English.  Participants, including judges, jurors, and counsel, are entitled to understand the proceedings in English.[3] Even apart from the mandates of the Jones Act, in Puerto Rico, where Spanish is the primary language of most of the

---

[3]    The public shares that entitlement to proceedings in English.  But the rights of the public are not impaired here.  All proceedings were in English; the only complaint is that the wiretap tapes were in Spanish.

population, there are nevertheless jurors, parties, and counsel whose primary language is English.

Here, the submission of English transcripts was required, assuming the transcripts were translated and transcribed accurately (an issue discussed infra).  Unlike in Rivera-Rosario, where the "English translation was . . . cast aside" and the jurors used Spanish transcripts instead, 300 F.3d at 5, the English transcripts here were made available to the jurors and used while the tapes were playing.  Furthermore, in this case, counsel made no objection below to the provision of the English transcripts to the jury.

2.    Ensuring the Reliability of Translation and of Transcription When Using English Transcripts

Before transcripts may be submitted to the jury even as aids, issues must be addressed both about the reliability of the transcription in the original language of the wiretaps and about the accuracy of the translation of those transcripts from the original language to English (here, from Spanish to English).  Commonly, the transcripts and the English translations of those transcripts are produced by the government and copies are then given to the defendant.  Sound trial management and considerations of fairness caution that the government provide these copies to defense counsel adequately in advance, so that disputes concerning the reliability of the transcription in the original language and of the English translation may be brought to the attention of the

district court or resolved by agreement.  Counsel, of course, may agree to the accuracy in both senses.

This court outlined in <u>Rengifo</u> the proper procedure for addressing transcription error:

> We believe that it is advisable for the district court to try to obtain a stipulated transcript from the parties before trial or, at least, before a transcript is used. Failing such stipulation, each party should be allowed to introduce its own transcript of the recording provided that it is properly authenticated.  When the jury receives two transcripts of the same recording, it should, of course, be instructed that there is a difference of opinion as to the accuracy of the transcripts and that it is up to them to decide which, if any, version to accept.  The jurors should also be instructed that they can disregard any portion of the transcript (or transcripts) which they think differs from what they hear on the tape recording.  Further limiting instructions will depend on the circumstances of each case.

789 F.2d at 983.  In short, if the defendant believes the transcription of the tape is in error as to what was said, then the dispute should be brought to the attention of the court.  Usually, the judge either makes a determination as to the correct transcription after listening to the tape or determines that the dispute is an issue of fact for the jury to decide.  This procedure applies to transcription disputes regarding both English and non-English transcripts.

In the case of tapes of non-English conversations, however, there is the additional problem of potential <u>translation</u> error.  If the parties do not agree that the English transcript submitted is correctly translated, the preferred solution is to

obtain agreement from counsel as to an accurate translation. If agreement is not possible, the district court should have the parties present testimony from translators and allow the jury to decide the issue. See Weinstein & Berger, Weinstein's Federal Evidence § 901.09.

Here, because Morales-Madera did not object to the accuracy of the translation or the transcription and he makes no claim on appeal that the English transcripts before the jury were inaccurate, no issue of that type is before us.

3.    Admitting English Transcripts In Evidence

Once translation and transcription disputes have been addressed and the transcripts have been submitted to the jury for its use, parties using audio recordings in other languages should ensure that the English transcripts become part of the record by introducing them in evidence.[4] The English transcripts should be marked and admitted in evidence in addition to the wiretaps themselves.[5] The issue of jury instructions was not raised either at trial or on appeal and has not been briefed, so it is not before

---

[4]    The trial court retains discretion as to what documentary evidence the jury is permitted to have during deliberations. See United States v. McCarthy, 961 F.2d 972, 978 (1st Cir. 1992) ("Whether . . . evidentiary exhibits properly admitted should or should not accompany the jury to the jury room is a discretionary matter for the trial court." (internal quotation marks omitted)).

[5]    Where, by contrast, the conversations on the tape are in English, the transcript is often marked as an exhibit for identification without being admitted.

-13-

us. Nonetheless, in these circumstances hereafter, an instruction that the jury should consider only what is on the tape and not what is in the English transcript would not be appropriate.

Parties frequently, as here, use the transcripts only as aids and fail to admit them in evidence. The usual reason given for not introducing transcripts in evidence is that the wiretap tapes themselves are the best evidence of the conversation, not the transcripts. See, e.g., United States v. Warner, 204 F.3d 799, 801 (8th Cir. 2000); Fed. R. Evid. 1002 ("To prove the content of a writing, recording, or photograph, the original writing, recording, or photograph is required . . . .").

The best evidence rule requires that the tape recordings themselves must be furnished, absent agreement to the contrary, but does not require that English translations of those tapes be excluded from evidence. Non-English recordings present unique problems of compliance with the Jones Act, which requires proceedings to be conducted in English. Accordingly, almost 20 years ago, this court approved the introduction in evidence of English transcripts for wiretaps of Spanish conversations, provided the reliability issues were worked out. Rengifo, 789 F.2d at 983.[6] The Eleventh Circuit reached the same conclusion about the admission in evidence of English transcripts of recorded

---

[6] Because the Rengifo case arose in Massachusetts, it did not present Jones Act issues.

conversations in Spanish in <u>United States</u> v. <u>Cruz</u>, 765 F.2d 1020, 1022-24 (11th Cir. 1985), as did the Seventh Circuit in <u>United States</u> v. <u>Jordan</u>, 223 F.3d 676, 688 (7th Cir. 2000).  This practice of admitting reliable English transcripts in evidence is entirely consistent with the best evidence rule.  The rationale behind the best evidence rule -- that "the [recording itself] is a more reliable, complete and accurate source of information as to its contents and meaning than anyone's description" of it, <u>Gordon</u> v. <u>United States</u>, 344 U.S. 414, 421 (1953) -- is not undercut when the original recording is played to the jury and the undisputedly accurate English transcript is admitted in evidence.  <u>See</u> <u>United States</u> v. <u>Holton</u>, 116 F.3d 1536 (D.C. Cir. 1997) ("concerns addressed by the best evidence rule are not at issue" in this situation).

Here, the government concedes that it committed error in failing to enter the English transcripts in the record.

4.    Adequacy of English-Language Record for Judicial Review

Where, as here, English transcripts are not part of the record, the issue arises of creating a sufficient record to allow judicial review under the Jones Act.  This problem exists not only on appellate review but also in the district court's review of the record when deciding Rule 29 motions.

Here, Morales-Madera's argument focuses on the adequacy of appellate review.  In simple terms, he argues that because the

-15-

trial record before this court has no English translation of the many wiretaps played to the jury, this court is unable to review the record to determine if the evidence was sufficient to convict. Absent the wiretaps, he says, the remaining evidence is plainly insufficient. He argues that Rivera-Rosario compels acceptance of his position.

We reject Morales-Madera's argument that Rivera-Rosario controls this case. This court's opinion in Rivera-Rosario is distinguishable on several grounds. Unlike this case, Rivera-Rosario involved a situation in which the jury was deprived of having English-language transcripts at all. Rivera-Rosario involved a unique sequence of events:

1. the government failed to provide English transcripts in advance, thus apparently depriving the defendants of a fair opportunity to raise and resolve issues of reliability as to the 180 tapes that constituted the heart of the government's case;

2. there was a dispute raised by the defendants at trial about the accuracy of the English translation of the transcripts of the wiretap tapes;

3. that dispute was neither resolved by the trial court by obtaining agreement nor submitted to the jury for resolution;

4. as a consequence, and this is a key distinction, the English transcripts were never submitted to the jury at all;

5. this problem was not mooted by the court reporter's transcribing the taped conversations as they were played in open court[7] or by the parties agreeing on or the jury determining the correct translation;

6. the government then failed to comply with the procedures of Fed. R. App. P. 10(e), which allow the government to supplement the record;

7. thus, the Court of Appeals was placed in the position of resolving a factual dispute as to the English translation.

300 F.3d at 5-9.

We trust that this sequence of events will not recur and that the U.S. Attorney's Office in Puerto Rico will meet its obligations.[8] Because the sequence of events here differs and the jury did have English transcripts, we do not apply Rivera-Rosario's reversible-error rule that "violations of the English language requirement will constitute reversible error whenever the appellant can demonstrate that the untranslated evidence has the potential to affect the disposition of an issue raised on appeal." Id. at 10.

---

[7]    As we have said, this procedure is not a required one.

[8]    This court was informed that the U.S. Attorney's Office in Puerto Rico often does not prepare transcripts until it is clear that defendants will not plead guilty.  The government may not, however, spring translated transcripts of wiretapped conversations on defense counsel at the last minute without raising the concerns discussed in this opinion.

Instead, we hold that because Morales-Madera did not raise his Jones Act claim in the trial court in the context of the facts of this case, our review of his claim is for plain error. See United States v. Olano, 507 U.S. 725, 731 (1993). A plain error is one that "seriously affects the fairness, integrity or public reputation of judicial proceedings." Id. at 732 (quotation marks, alterations, and citation omitted). In other words, an error is plain if "a miscarriage of justice would otherwise result." United States v. Young, 470 U.S. 1, 15 (1985).

The government has conceded that a Jones Act error occurred when it failed to introduce the English transcripts in evidence or mark those transcripts as exhibits. On appeal, the government sought to use Fed. R. App. Proc Rule 10(e) to supplement the record with copies of the English transcripts actually used at trial. The framers of the Federal Rules of Appellate Procedure, who anticipated a generic class of problems involving insufficiency of the record, created the following procedure in Rule 10(e):

> If anything material to either party is omitted from or misstated in the record by error or by accident, the omission or misstatement may be corrected and a supplemental record may be certified and forwarded:
> (A) on stipulation of the parties;
> (B) by the district court before or after the record has been forwarded; or
> (C) by the court of appeals.

At least where there is no issue of transcription or translation error and where the jurors and other participants had the English

transcripts available to them during the trial, the Rule 10(e) procedures may be used to supplement the record.

Here, however, the government's attempt to supplement the record failed to comply with Rule 10(e). The government did not obtain a stipulation from defense counsel or submit the transcripts to the district court for certification. Instead, the government simply filed in the district court what the government said were accurate copies, with a request that they be transmitted to the court of appeals. The clerk of the district court did so within a day, without the trial court ever certifying that the copies submitted were accurate copies of the English transcripts used at trial. The defendant did not object to the trial court or to this court that these were not accurate copies of what had been used at trial, preferring to rely on his argument that the government could not supplement the record at all.

While the defendant may have forfeited and/or waived any objection that the submitted transcripts are not accurate copies of the transcripts before the jury, we are reluctant to review a criminal conviction based on English transcripts that may not be accurate copies of those used at trial. Accordingly, at oral argument, we asked counsel to confer and advise us whether they could agree that the transcripts submitted by the government are accurate copies of those used at trial. We were explicit that the inquiry did not include issues of transcription or translation

error; those issues were forfeited at trial and waived in this court. The parties reported back to us that the transcripts are indeed the same as those used at trial. We therefore accept the transcripts as supplementing the record under Rule 10(e). We do, however, urge the Office of the U.S. Attorney in Puerto Rico to be more mindful of the requirements of Rule 10(e) in the future.

With the addition of these transcripts, the English-language record is sufficient for appellate review. Fifty-one of the fifty-two wiretaps have been transcribed and translated into English. One wiretap tape (Exhibit No. 4) is beyond our review because the government did not provide the jury with English transcripts of it. Relying on Rivera-Rosario, Morales-Madera argues that this tape might contain evidence that undermines confidence in the jury's verdict, even if other evidence on the record would otherwise be sufficient to sustain his conviction. We disagree. In Rivera-Rosario, the court was unable to review any of the 180 tapes, 300 F.3d at 12, whereas we are able to review all but one of the 52 tapes here. Moreover, in Rivera-Rosario, the 180 tapes constituted the "gravamen" of the government's case, whereas there is no indication that Exhibit No. 4 carries such importance in this case. The government does not rely on Exhibit No. 4 to establish Morales-Madera's role in the conspiracy; he is not one of the conversants and there is no indication that he was even mentioned in the conversation. Agent Cases provided a summary of

the contents of the tape to the jury in his testimony, and stated only that Naranjo-Rosa and Rivera-Rosario were discussing two planned shipments of 500 kilograms of cocaine and the income they would receive from those shipments. Agent Cases made no mention of Morales-Madera. Morales-Madera has given us no reason why Exhibit No. 4 is likely to subvert the evidence in all the other tapes. We find no plain error on these facts.

## B.    Closing Arguments

Morales-Madera argues that the government's closing arguments were improper. His brief is unclear as to whether those arguments were transcribed. Counsel, after being asked about the issue at oral argument, informed the court that the opening and closing arguments were available for transcription but that Morales-Madera had not requested that the court reporter transcribe them. It is his burden to submit such a request, and by failing to do so, he waived the issue. In any event, the strength of the government's evidence was overwhelming, and any claim of prejudice based on the closing argument would have been an uphill battle.

## C.  Sufficiency of Evidence

In a sufficiency of evidence challenge, we uphold the verdict unless, viewing the evidence in the light most favorable to the prosecution, no reasonable jury could have found the defendant guilty. United States v. Nelson-Rodriguez, 319 F.3d 12, 27 (1st

Cir. 2003). Here, with the wiretap tapes, the evidence was plainly sufficient to convict.

To prove the elements of conspiracy, the government must demonstrate "the existence of a conspiracy, the defendant's knowledge of the conspiracy, and the defendant's voluntary participation in the conspiracy." United States v. Gomez-Pabon, 911 F.2d 847, 852 (1st Cir. 1990). To show that the defendant voluntarily participated in the conspiracy, the government must demonstrate that the defendant had the intent to agree to the conspiracy and the intent to effectuate the object of the conspiracy. United States v. Ruiz, 105 F.3d 1492, 1499 (1st Cir. 1997). This intent may be inferred from circumstantial evidence. Nelson-Rodriguez, 319 F.3d at 28. But mere association with conspirators or mere knowledge of the conspiracy's activities is not sufficient alone to establish guilt. Gomez-Pabon, 911 F.2d at 853.

Here, the evidence was clearly sufficient to establish the existence of the conspiracy. The jury heard fifty-two wiretapped conversations in which conspirators used what Agent Cases testified was coded language such as "cars," "whitewall tires," and "parts" to discuss the importation and distribution of drugs.

Agent Cases's testimony and the wiretaps were sufficient to allow a jury to conclude that Morales-Madera had detailed

knowledge of the conspiracy's planned importation of heroin from the Dominican Republic and the conspiracy's pricing and debt collection practices for cocaine and heroin. Agent Cases testified that in three wiretapped conversations on April 15, Morales-Madera used coded language to plan the exchange of bad drugs for good drugs, discuss pricing of twenty kilograms of cocaine, and calculate the amount of drug-related debt. Agent Cases also testified that in coded language in five wiretapped conversations from April 29 to May 2, Morales-Madera received instructions from Naranjo-Rosa about the collection of cocaine-related debt, discussed pricing for 625 grams of heroin that had already been purchased, and referred to plans to return spoiled heroin that they had purchased from the Dominican Republic.

A jury could also reasonably infer that Morales-Madera voluntarily participated in the conspiracy. Morales-Madera was apparently familiar with the coded references to drugs and prices, and planned to collect debts and import heroin for the conspiracy. Other evidence corroborates this interpretation of the wiretaps. Naranjo-Rosa admitted in one wiretapped conversation that he suspected his phone was tapped and chastised Morales-Madera for failing to speak in code, thus corroborating Agent Cases's testimony that the speakers were using coded language. Morales-Madera's role as a collector of drug debts is also corroborated by his non-coded references in one wiretapped conversation to a

$30,000 debt owed to Gutierrez-Naranjo and his testimony at trial that he helped collect debts for Guiterrez-Naranjo despite his belief that those debts were drug-related. Finally, passports and boarding passes indicate that Morales-Madera did in fact travel to the Dominican Republic three times with either Naranjo-Rosa or Naranjo-Rosa's cousin, as described on the wiretaps.

We reject Morales-Madera's sufficiency of evidence challenge and affirm his conviction.

**D.  Sentencing Errors**

1.  Drug Quantity

Morales-Madera argues that the district court erred in determining that he was responsible for more than 150 kilograms of cocaine.  As a result of this determination, Morales-Madera had a base offense level of 38.  This offense level, combined with his criminal history category I, resulted in a range of 235 to 293 months imprisonment.  The district court sentenced him to 250 months.

We review factual determinations at sentencing for clear error.  United States v. Damon, 127 F.3d 139, 141 (1st Cir. 1997).  Because Morales-Madera did not raise this issue below, our review is also for plain error.  We find no such error.

Under the Sentencing Guidelines, each defendant must be sentenced based on the amount of drugs that he handled, saw, or could reasonably have foreseen to be embraced by the conspiracy.

-24-

<u>United States</u> v. <u>Rodriguez</u>, 162 F.3d 135, 149 (1st Cir. 1998); U.S.S.G. § 1B1.3 & cmt. 2.  This determination must be based on a preponderance of evidence.  <u>United States</u> v. <u>Nieves</u>, 322 F.3d 51, 54 (1st Cir. 2003).

Here, the government relies on trial testimony from Agent Cases about a wiretapped conversation between Naranjo-Rosa and Rivera-Rosario about two planned shipments of 500 kilograms of cocaine.  This amount, the government contends, was foreseeable to Morales-Madera because of his close relationship with Naranjo-Rosa.  Morales-Madera, on the other hand, argues that Agent Cases's trial testimony is based on a wiretapped conversation for which the jury was not provided an English transcript; he argues that there is no way to determine, on appeal, if Agent Cases's testimony was an accurate reflection of the content of the tapes.  We need not resolve this issue because the Pre-Sentence Investigative Report (PSR) is sufficient to support the district court's finding.

The PSR found the drug quantity attributable to Morales-Madera to be in excess of 150 kilograms, and Morales-Madera did not object.  Because drug quantity need only be determined by a preponderance of the evidence for sentencing purposes, a district court may generally rely on the PSR in making this determination.  <u>United States</u> v. <u>Cyr</u>, 337 F.3d 96, 100 (1st Cir. 2003).  If a defendant's objections to the PSR are unsupported, <u>id.</u>, or the

defendant makes no objections, the court is entitled to rely on the PSR alone.  Morales-Madera's sentence was not clearly erroneous.

2.  Denial of Downward Adjustment for Minor Role

Morales-Madera argues that the district court erred in failing to consider a two-level downward adjustment for a minor role in the conspiracy.  U.S.S.G. § 3B1.2.  Morales-Madera did not argue for this adjustment at sentencing and did not object to its omission from the PSR.  "[I]n [the] criminal sentencing context, arguments not addressed to the trial court at the appropriate time are deemed to be abandoned."  United States v. Ortiz, 966 F.2d 707, 717 (1st Cir. 1992) (citing United States v. Dietz, 950 F.2d 50, 55 (1st Cir. 1991) (collecting cases)).

Even if Morales-Madera had preserved his objection, his argument would fail.  Review of the decision to deny a downward adjustment for minor role is for clear error.  United States v. Rosario-Peralta, 199 F.3d 552, 571 (1st Cir. 1999).  No such error occurred here.  The district court could reasonably have concluded that Morales-Madera was not a minor participant.  Agent Cases testified that Morales-Madera was the right-hand man of Naranjo-Rosa.  This testimony is confirmed by the wiretaps, which show Morales-Madera discussing the price of 20 kilograms of cocaine, planning to collect a $30,000 debt for Gutierrez-Naranjo, determining the price for 625 grams of heroin from the Dominican Republic, and making travel arrangements to the Dominican Republic

to purchase heroin.  These activities could reasonably be viewed as more than minor participation.

3.  Credit for Time Served in Dominican Republic

Morales-Madera also argues that the court erred in failing to consider a downward departure based on a three-year sentence that he served in the Dominican Republic for drug trafficking offenses from May 1, 1997 until November 29, 2000.  A district court's refusal to depart downward is generally not reviewable on appeal, unless the refusal stemmed from a misapprehension of its authority under the guidelines.  United States v. Rivera-Rodriguez, 318 F.3d 268, 275 (1st Cir. 2003).  Here, Morales-Madera argues that the district court failed to recognize its authority to depart downward under U.S.S.G. § 5K2.0 to credit him for time served.

Morales-Madera did not request a downward departure on this basis at sentencing, but only argued that his sentence should be at the lower end of the guidelines range because of his time served.  "Defendant's failure to request a downward departure on this ground in the district court forecloses our consideration of the issue."  United States v. Field, 39 F.3d 15, 21 (1st Cir. 1994).

Even if we were to review Morales-Madera's claim for plain error, his argument would be unavailing.  The parties dispute whether the district court had the power to depart downward in this

situation. Morales-Madera concedes that his sentence in the Dominican Republic has already been discharged. Although a different procedure exists for undischarged sentences,[9] defendants who seek credit for discharged sentences must ordinarily apply to the Attorney General, through the Bureau of Prisons, under 18 U.S.C. § 3585(b). See United States v. Wilson, 503 U.S. 329, 335 (1992). Only after exhausting administrative review of this determination may defendants seek judicial review. United States v. Collazo-Aponte, 216 F.3d 163, 205-06 (1st Cir. 2000), vacated on other grounds, 532 U.S. 1036 (2001). Morales-Madera argues that he can circumvent this requirement by seeking a downward departure from the district court at sentencing. He relies on Application Note 7 to U.S.S.G. § 5G1.3, which discusses potential downward departures for discharged sentences. The government argues otherwise, citing cases from other circuits denying district courts the authority to depart downward based on time served. See United States v. Luna-Reynoso, 258 F.3d 111, 116-17 (2d Cir. 2001); United States v. McHan, 101 F.3d 1027, 1040 (4th Cir. 1996). The government also notes that Application Note 7 did not come into effect until November 1, 2002, after Morales-Madera's sentencing on January 15, 2002.

---

[9] The Sentencing Guidelines require sentences to run concurrently if the defendant faces an "undischarged term of imprisonment" for another offense that is already fully taken into account in sentencing for the instant offense. U.S.S.G. § 5G1.3.

-28-

We need not resolve this issue. Even assuming arguendo that the district court had the power to depart downward on this basis, Morales-Madera's substantial rights are not affected. He is not prejudiced because he can apply to the Bureau of Prisons under § 3585(b) to obtain credit for his time served in the Dominican Republic. Thus, no plain error occurred.

**E.  Purported Adoption of Co-Defendants' Arguments**

Five individuals who were originally indicted with Morales-Madera were convicted in a separate trial. Two of those five defendants had their convictions reversed on appeal in <u>Rivera-Rosario</u>, 300 F.3d at 21. Morales-Madera requests leave to adopt the factual and legal arguments raised by those five defendants in their appeal. We deny his request.

The English-language issues in this trial are not the same as those in <u>Rivera-Rosario</u> and are disposed of in this opinion. To the extent Morales-Madera purports to raise other issues, his cursory attempt at adoption does not tell us what those issues are. He has not met his burden of showing that he is in the same legal and factual position as the defendants in <u>Rivera-Rosario</u> with regard to those issues. Those arguments are therefore waived. <u>United States</u> v. <u>Zannino</u>, 895 F.2d 1, 17 (1st Cir. 1990).

**III.**

Morales-Madera's conviction and sentence are **affirmed**. So ordered.

-29-