# United States Court of Appeals
## For the First Circuit

No. 03-1584
No. 03-1617

UNITED STATES OF AMERICA,

Appellee,

v.

FELIX VEGA,
and
MANUEL FERNÁNDEZ CARRERA,

Defendants, Appellants.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Carmen Consuelo Cerezo, U.S. District Judge]

Before

Boudin, Chief Judge,
Selya, Circuit Judge,
and Lynch, Circuit Judge.

Thomas F. Klumper, Assistant United States Attorney, with whom
H.S. Garcia, United States Attorney, and Nelson Perez-Sosa,
Assistant United States Attorney, Senior Appellate Attorney, were
on brief, for appellee.
Ramon M. Gonzales for appellant Felix Vega.
Laura Maldonado Rodríguez for appellant Manuel Fernández
Carrera.

February 24, 2005

**LYNCH**, <u>Circuit Judge</u>.  Felix Vega and Manuel ("Jesús") Fernández Carrera, were convicted after trial, along with two other co-defendants, for conspiracy to distribute cocaine in excess of five kilograms, in violation of 21 U.S.C. § 846.  Vega was sentenced to 120 months' imprisonment and a five year supervised release term.  Fernández Carrera was sentenced to seventy-eight months' imprisonment and a five year supervised release term.  In these consolidated appeals, Vega challenges his sentence while Fernández Carrera challenges both his conviction and a portion of his sentence.  We consider each challenge in turn.

<u>Vega's Sentencing Appeal</u>

Vega mounts two challenges to his sentence.  First, he argues that neither the jury nor the district court made an individualized finding that more than five kilograms of cocaine were attributable to or foreseeable by him as part of his involvement in the conspiracy, and therefore the application of the statutory mandatory minimum of 120 months that attaches to such a finding was error.  Second, he argues that it was error for the district court to adopt the findings of the Presentence Investigation Report (PSR) assigning him a Criminal History Category of II.

The trial for all four co-defendants lasted twelve days.  At the close of evidence, on September 26, 2002, the court gave

-2-

extensive instructions to the jury.  The instructions relevant to

Vega's appeal were:

> Now, it is alleged that the defendants and others conspired to knowingly and intentionally distribute a controlled substance.  If you find beyond reasonable doubt that the defendants conspired to knowingly distribute the controlled substance -- in this case the controlled substance alleged is cocaine -- you shall then determine whether the government has proven beyond reasonable doubt that the conspiracy involved more than five kilograms of cocaine as charged in Count 1.
>
> Please note that a defendant who knowingly and willingly participates in a drug conspiracy is accountable not only for his own acts, but he or she may also be held responsible for the acts of others, if those acts or actions of others were reasonably foreseeable by the individual defendant and those acts or actions were committed in furtherance of the conspiracy.

Vega has not challenged the correctness of the instructions.

The jurors were then given both a general verdict form

and special verdict form for each defendant.  The general verdict

form asked the jury to state whether it found each defendant guilty

or not guilty of Count I of the indictment: conspiracy to possess

with intent to distribute a controlled substance.  Vega's special

verdict form asked:

> If you find the defendant **Felix Vega** guilty of the conspiracy charged in Count I, please answer the following question:
> 1) Do you unanimously agree, by proof beyond a reasonable doubt, that the quantity of cocaine which was distributed and/or intended to be distributed as part of the conspiracy was more

than five (5) kilograms as charged in the indictment?

This instruction was consistent with the law of this circuit at the time, which allowed for the jury to make a finding as to the quantity of drugs attributable to the conspiracy as a whole, and allowed the district court to make individualized quantity determinations for each co-conspirator for sentencing purposes. See Derman v. United States, 298 F.3d 34, 42-43 (1st Cir. 2002).

The following morning, September 27, 2002, during jury deliberation the jury submitted a note to the court asking for clarification:

> If the evidence shows that an individual is part of a conspiracy and the conspiracy network has distributed in excess of 5 kilos of cocaine does it automatically make every single individual guilty of distributing in excess of 5 kilos of cocaine?

That question may well have been intended to explore the gap between the instructions and the special verdict form. After receiving the note, the district judge met in chambers with the attorneys for the defendants and the government. The judge said that she thought the jurors were confused as to whether they must consider the evidence against each defendant individually, and proposed an instruction in response that would clarify that issue. She asked the attorneys for the defendants if they objected to this

clarifying instruction, and they did not object.[1]  The court then responded to the jury in writing that the answer to their question was no, and that it would instruct the jury on "giving separate consideration to each individual defendant."  The court's instruction stated:

> Members of the jury, the case of each defendant and the evidence pertaining to that defendant should be considered separately and individually.  The fact that you may find one of the defendants guilty or not guilty should not control your verdict as to any other defendant.

The jury then continued with its deliberation.  That afternoon the jury reached a verdict of guilty for Vega, as well as all three co-defendants, on Count I, and answered yes to Vega's special verdict question that more than five kilograms of cocaine was attributable to the conspiracy.  There was no request from defense counsel for clarification of the verdict.

Several months later, at Vega's sentencing hearing, Vega's counsel said that he discussed with Vega fully the findings of Vega's PSR, and that there were no objections to the PSR.  The

---

[1]     Only counsel for the government raised to the district court during this conference the possibility that the jurors may have already decided the question of guilt and were confused about the special verdict question and individualized quantity determinations.  The court then restated its understanding of the jury's concern, and explained to counsel that "[i]f there is a different concern in their mind, they can come back to the Court to state that, if I have not answered completely or correctly."  No defense counsel spoke up to share the government's possible concern, and none objected to the district court's response to the jury's question.

PSR stated that Vega's offense involved more than five kilograms but less than fifteen kilograms of cocaine, which triggers the mandatory minimum of 120 months under 21 U.S.C. § 841(b)(1)(A)(ii). Vega said that he understood his counsel's explanation of the PSR. Neither Vega nor his counsel argued that more than 5 kilograms of cocaine could not be attributed to him. Vega's counsel then argued that nothing in the PSR required the court to sentence Vega above the statutory mandatory minimum of 120 months, and that Vega should receive that minimum. The government also requested a sentence of the mandatory minimum. The court then sentenced Vega to the mandatory minimum of 120 months' imprisonment.

For the first time on appeal, Vega challenges the application of the mandatory minimum sentence. Vega does not argue the jury was required to make this finding of drug quantity. See Blakely v. Washington, 542 U.S. ___, 124 S. Ct. 2531 (2004); c.f. United States v. Cotton, 535 U.S. 625, 634 (2002). He argues that neither the jury nor the district court made an individualized determination as to drug quantity, but rather applied the conspiracy-wide drug quantity to him automatically, as did the probation office in his PSR. Relying on a subsequent decision in United States v. Colon-Solis, 354 F.3d 101 (1st Cir. 2004), he argues that the district court committed error by automatically applying the conspiracy-wide drug quantity to him, and therefore erred in applying the mandatory minimum sentence. He does not

-6-

explain why the judge, who properly instructed on the law as to the need for personalized findings of drug quantity, would have suddenly shifted to adopt a per se rule.

Vega's belated challenge gets him nowhere. First, Vega has arguably waived the issue of drug quantity by affirmatively agreeing to the 120-month mandatory minimum sentence at his sentencing hearing. United States v. Ruiz-Garcia, 886 F.2d 474, 476 (1st Cir. 1989) (holding that defendant waives objection to existence of a sentencing factor raised for first time on appeal where defendant conceded that factor below). In any event, by not raising an objection below, Vega has at least forfeited the issue, and he cannot demonstrate that the district court committed plain error. See United States v. Barbour, 393 F.3d 82, 89 (1st Cir. 2004). Whether or not the instruction is ideal under later developed law, there is no indication that the jury would probably have reached a different result under a perfect instruction, or that an injustice has resulted. See United States v. Dominguez Benitez, 542 U.S. ___, 124 S. Ct. 2333, 2340 (2004); United States v. Olano, 507 U.S. 725, 736 (1993).[2]

Accordingly, we **affirm** Vega's sentence.

---

[2] Vega further claims that the district court improperly calculated his Criminal History Category by improperly counting a prior conviction for a minor offense. Given that Vega's sentence is a result of a statutory mandatory minimum, which we have upheld, this second claim is moot.

Fernández Carrera

Fernández Carrera challenges the sufficiency of the evidence to support his conviction for conspiracy to distribute cocaine. In order to overturn his conviction, this court must find, viewing the evidence in the light most favorable to the prosecution, that no rational jury could have found Fernández Carrera joined the conspiracy. United States v. Reyes, 352 F.3d 511, 517 (1st Cir. 2003).

Fernández Carrera was known to his friends as "Jesús." Fernández Carrera argues that the evidence suggests there was a person named "Jesús" involved in the conspiracy, but that it was someone else, another "Jesús." He points primarily to the fact that some of the principal members of the conspiracy were taped stating that they were going to see what "Jesús says" on December 4, 1999. This was two days after the defendant was arrested for possession of cocaine and while he was still in custody at the MDC-Guaynabo facility. From this, he argues, he could not have talked with them and that the conspirators had to have known that he was in jail and so they could not see him. And that, he argues, means he should have been acquitted, because it had to have been a different "Jesús" to whom the co-conspirators referred.

His argument fails on several fronts. There was adequate other evidence of his participation in the conspiracy. And the fact that he was imprisoned on December 4 proves nothing, much less

that he is not guilty. Special Agent Juan de Jesus identified Fernández Carrera as the speaker in, or subject of, multiple conversations having a direct bearing on his knowledge of and participation in the conspiracy. In the first, occurring on December 2, 1999, the date of Fernández Carrera's arrest, Juan Espiritu Santo, one of the principal members of the conspiracy, told Fernández Carrera about an incident that had occurred on November 28, 1999, during which some conspirators had dumped drugs into the ocean when their boat was intercepted by the Coast Guard. During this conversation Juan also agreed to meet Fernández Carrera. As further evidence that the "Jesús" on this call was in fact Fernández Carrera, the government introduced evidence from Fernández Carrera's arrest report where he revealed that the number which Juan had called on December 2, 1999 was his home phone number.

Later that day, December 2, 1999, police officers came to Fernández Carrera's house, following a 911 call about a domestic violence dispute, and received permission to enter and search the premises. They found four brick-shaped packages of cocaine, weighing approximately four kilograms, and arrested Fernández Carrera. The following day he was taken into federal custody and brought to the federal jail at MDC-Guaynabo, where he remained in custody until December 9, 1999.

Two days later, on December 4, 1999, Juan Espiritu Santo spoke with Cristobal Garcia, the ringleader of the conspiracy, and stated that he had given four "shoe boxes" to Jesús, which Agent Juan de Jesus testified referred to his giving four kilograms of cocaine to Fernández Carrera. The government then submitted transcripts of subsequent calls, all occurring on the same day, between Juan and Cristobal in which first they are trying to ascertain what happened to Jesús. Cristobal tells Juan to go and "see what Jesús says," and finally they learn that he had an "accident," which the Special Agent interpreted to mean he had been arrested. In a later call that day, introduced by the defense, Cristobal again tells Juan to go and see Jesús.

Fernández Carrera attempts to use the fact that he was in jail at the time Juan and Cristobal talked on December 4 about going to see "Jesús" as evidence that there must have been another Jesús they were trying to see, as they knew Fernández Carrera was in jail and could not have possibly gone to see him. This argument misrepresents the record. The Agent testified that while on December 4, 1999, Juan and Cristobal discovered that Jesús (clearly Fernández Carrera) had been arrested at some point, the phone conversations did not indicate that Juan and Cristobal knew that Fernández Carrera was still in jail.

The evidence shows that Juan stated in coded drug language that he had given four kilograms of drugs to "Jesús," that

Fernández Carrera was arrested in his home with four kilograms of drugs, and that Juan and Fernández Carrera spoke with one another about a shipment of drugs that had gone bad just a week earlier; there was more than adequate evidence for a rational jury to find that Fernández Carrera knew of and joined the conspiracy.

Supervised Release

Fernández Carrera also raises for the first time on appeal the argument that the district court impermissibly delegated to the probation officer the authority to decide whether the defendant should undergo drug treatment if he tests positive for drugs during his term of supervised release. See United States v. Melendez-Santana, 353 F.3d 93, 103 (1st Cir. 2003). The government concedes that the delegation constituted plain error, id. at 106, and agrees that this court should remand for resentencing both on this issue, and the related issue of the number of drug tests Fernández Carrera should be forced to undergo. As we are bound by the decision of the earlier panel in Melendez-Santana on this issue, we accept the government's position and remand for limited adjustment of the drug treatment portion of the sentence.

Accordingly, we **vacate** Fernández Carrera's sentence only to the extent it delegates the terms of his drug testing and treatment during the period of his supervised release, and remand for resentencing on this sole issue. In all other respects, Fernández Carrera's conviction and sentence are **affirmed**.