# United States Court of Appeals
## For the First Circuit

No. 04-1258

UNITED STATES,

Appellee,

v.

CARLOS M. ESCOBAR-FIGUEROA,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Juan M. Pérez-Giménez, U.S. District Judge]

Before

Lynch, Circuit Judge,

Campbell, Senior Circuit Judge,

and Howard, Circuit Judge.

Rafael Anglada-López for appellant.
Judith Vargas, Assistant United States Attorney, with whom
H. S. Garcia, United States Attorney, and Nelson Pérez-Sosa and
Thomas F. Klumper, Assistant United States Attorneys, were on
brief for appellee.

July 7, 2006

**CAMPBELL**, **Senior Circuit Judge**.  Defendant-appellant Carlos M. Escobar-Figueroa (hereinafter "Escobar") appeals from his conviction and sentence in the United States District Court for the District of Puerto Rico on a charge of conspiracy to possess with intent to distribute cocaine, cocaine base ("crack"), and heroin. He raises four issues on appeal:  (1) whether the evidence was sufficient to support the jury's convicting him as a participant in a single rather than multiple drug conspiracies; (2) whether the district court erred, when sentencing, in not departing downward on the ground Escobar was a minor participant in the conspiracy, and in adding a two-level enhancement for possession of a firearm; (3) whether the district court erred in sentencing him without finding the specific drug amounts for which he was personally responsible; and (4) whether his case should be remanded to the district court for resentencing under United States v. Booker, 543 U.S. 220 (2005).  We affirm Escobar's conviction and sentence.

## I.  Background and Facts

On October 4, 2002, a grand jury indicted Escobar and forty-two others.  Escobar and his co-defendants were charged in Count One with a conspiracy to possess with the intent to distribute and to distribute five or more kilograms of cocaine, fifty or more grams of crack, and/or one or more kilograms of heroin, in violation of 21 U.S.C. §§ 841(a)(1) and 846.  Escobar pled not guilty, and, on August 5, 2003, a jury trial commenced

-2-

involving, besides Escobar, five co-defendants, all or most of the others having pled guilty. Trial lasted thirty-one days and ended in findings of guilty as to the defendants on September 29, 2003. Responding to questions in a special verdict form provided by the court, the jury confirmed that the conspiracy as charged in Count One distributed and/or intended to distribute cocaine in the quantity of five (5) kilograms or more, heroin in the quantity of one (1) kilogram or more, and crack in the quantity of fifty (50) grams or more. The court denied Escobar's motion for judgment of acquittal. Following his sentence on January 23, 2004, Escobar filed this timely appeal on January 28 of that year.

## A. The Evidence

The evidence at trial showed that from at least 1993 to approximately 2002, Jose Anibal Davila-Lopez, a/k/a Jose Cabezon ("Cabezon"), was the leader and organizer of a drug trafficking organization know as Las Abispas. In the Guayama and Salinas areas of Puerto Rico, Cabezon rented a number of drug points to Las Abispas members, all of whom answered to him. Escobar was one such member. Different members sold many different kinds of drugs, including cocaine, crack, heroin, and marijuana. Las Abispas sellers received drugs from co-defendants Heriberto Ofray-Campos ("Ofray"), Wilson Mendoza-Vasquez ("Mendoza"), and Modesto Zaragoza Lasa ("Zaragoza Lasa"), as well as from cooperating witness Abdul Mendoza-Lebron ("Mendoza-Lebron").

Among the drug points operated by Las Abispas were two at La Puenta De Jobos Ward in Guayama, one in the Santa Ana quarter, managed by Dennys Cruz-Pereira, and one in the Miramar quarter, run by Escobar and his brother. The Miramar drug point sold primarily crack. Escobar and his brother would buy cocaine and make it into crack or buy crack from Las Abispas's sources, including from Ofray and Mendoza, and cooperating witness Mendoza-Lebron.

Escobar played an active role in the operation of the Miramar drug point, buying and preparing drugs for the point, pricing the drugs, and maintaining the proceeds from the point. Mendoza-Lebron testified that Escobar stashed drugs and weapons for him. He also testified to selling an eighth of a kilogram of crack per week to Escobar over a period which, from Mendoza-Lebron's other testimony, could be inferred to have lasted from 1994/1995 to 1999. Mendoza-Lebron testified that Escobar would sometimes sell crack to co-defendant Cruz-Pereira. The government put in evidence a tape-recorded conversation between Escobar and a government informant, Angel Lugo-Villodas, in which Escobar said he was waiting for the cocaine to make the crack and bragged to the informant that he had better crack than his brother and Cruz-Pereira and Mendoza. Lugo-Villodas subsequently bought vials of crack from Escobar.

There was also testimony from several Puerto Rico police officers who had been involved in undercover purchases of drugs

from Escobar and/or observed several drug transactions being conducted in front of Escobar's residence. On September 29, 1998, undercover officer Edwin Rosas Ferrer bought several small ziplock bags of cocaine from Escobar at the drug point. On or about August 14, 2002, officer Carlos De Jesus conducted surveillance at the drug point. He observed several drug transactions taking place in front of Escobar's residence. The Puerto Rico Police Department thereafter obtained a warrant to search the residence. Drugs and $1,093 were seized from Escobar's residence. After waiving his Miranda rights, see Miranda v. Arizona, 384 U.S. 436, 444 (1966), Escobar admitted the drugs belonged to him and the money came from drug proceeds.

**B. Escobar's Sentencing**

Following conviction, and prior to sentencing, Escobar received his presentence investigation report ("PSI" or "Report") on December 10, 2003. In describing the drug conspiracy for which Escobar was convicted, the Report on the cover page termed it as being a conspiracy to possess and distribute "not less than one hundred and fifty (150) kilograms of cocaine," whereas, in fact, the conspiracy charged in the indictment and later confirmed in the jury's special verdict finding was one to possess and distribute "five or more kilograms of cocaine, fifty grams or more of cocaine base, and/or one kilogram or more of heroin." The PSI correctly described the charged offense in its discussion of the charge and

-5-

conviction but used the 150 kilograms of cocaine standard in computing a proposed guidelines sentence. In determining that sentence, the PSI calculated: 1) a base offense level of thirty-eight (38) under USSG § 2D1.1(c) (the PSI expressly derived this offense level from its unexplained supposition that the offense involved not less than one hundred fifty (150) kilograms of cocaine); 2) a two-level enhancement for possession of firearms under USSG § 2D1.1(b)(1); and 3) a two-level enhancement for managerial or supervisory role in the offense under USSG § 3B1.1(c). These figures added up to a total offense level of forty-two (42). The total offense level, along with a criminal history category of I, resulted in a proposed guideline sentencing range of 360 months' imprisonment to life.[1]

---

[1]Where the figure of 150 kilograms of cocaine came from is not entirely clear. The amounts charged in the indictment as objects of the conspiracy were five or more kilograms of cocaine, fifty or more grams of crack, and/or one kilogram or more of heroin. The special jury finding confirmed a finding of these amounts. (The minimum amounts in total, if used as the basis for sentencing, would have produced a base offense level of 34. USSG § 2D1.1(c).) The PSI did not discuss the trial evidence insofar as it related to Escobar's involvement with particular drugs and drug amounts. No trial evidence has been called to our attention showing that Escobar dealt specifically with 150 kilograms of cocaine. In fact, most all of Escobar's dealings were with crack. The trial testimony of the informant, Mendoza-Lebron, was that Escobar had bought from him, weekly, 1/8 of a kilogram of crack for a period that would have been four or more years. If Escobar had weekly received 1/8 of a kilogram of crack for no more than twelve weeks, this amount, if found by the court, would have added up to 1.5 kilograms of crack, triggering a guidelines offense level of 38. Id. Thus, a base offense level of 38 was supported in the record, albeit not on the basis of the drug (cocaine) and quantity (150 kilograms) stated on the cover of the PSI and used to calculate the

At Escobar's sentencing hearing, held on January 23, 2004, the district court began by asking, "Counsel, have you read the pre-sentence report?" to which counsel for Escobar replied, "Yes, Your Honor." The court then addressed defendant, asking, "Mr. Escobar, are you aware of the contents of the pre-sentence report?" Defendant replied, "Yes," and also acknowledged his attorney had translated to him the information contained in the report.

The court asked next, "Is there anything that needs to be corrected at the time as to the information in the report?" Escobar's counsel at first replied, "Yes, Your Honor, we did file an objection as to some information--."[2] To this the court

_____

proposed guidelines range. Escobar's counsel did not question the drug and drug level set forth in the PSI, which the judge later used also as the basis for sentencing. At the beginning of the sentencing hearing, the district court asked Escobar if there was anything in the PSI that needed correction. His counsel, who, having represented Escobar at trial, was familiar with the evidence against his client, replied that nothing in the report needed correction, except for removal of the two-level enhancement for a managerial or supervisory role. When the court announced it would remove from its calculations the PSI's two-level supervisory role enhancement, Escobar's counsel said, "Very well . . . [t]hat would be all as to objections." In later announcing its sentence, the district court expressly relied upon a base offense level of 38, stating "the offense or [sic] conviction involved more than one hundred and fifty kilograms of cocaine, <u>that is having done the equivalency factors</u>" (emphasis supplied). The latter remarks suggests the judge may have had in mind the equivalency between 150 kilograms of cocaine and 1.5 kilograms of crack, as set out in the USSG § 2D1.1(c).

[2]Escobar had earlier filed with the U.S. Probation Officer an objection to the imposition of a two-level enhancement for his having had a managerial role in the offense.

reiterated, "Any corrections, prior to getting to the objections, any corrections that need--." Escobar's counsel said, "No, no corrections at this time, Your Honor," and the court then asked Escobar himself, "Is there anything in the report you wish me to correct," to which Escobar responded, "No." Like questions were put by the court to government counsel, similarly evoking negative answers.

The court then turned to Escobar's counsel, saying, "Counsel, you do have an objection to the pre-sentence calculations?" Counsel replied, "Right, that is correct . . . . Our objection is based on the fact that the pre-sentence report indicates that my client was an organizer, or leader, or manager or supervisor." To this the court replied, "Objection is sustained, granted. I will not follow the recommendation of the probation officer for a two-level enhancement." Escobar's counsel then responded: "Very well, Your Honor. That would be all as to the objections."

The court then enquired, "Is there anything you [counsel] would like to state to the court on behalf of your client before I pronounce sentence?"

Escobar's counsel responded with a plea for a sentence at "the lower end of the guidelines," citing Escobar's youth, his father's absence, his residence in a very poor area of Guayama, and his lack of early guidance. Counsel ended by saying, "That's the

only request that we make, Your Honor, that he be sentenced as to the lower end of the guidelines applicable in this case."

The court then heard from Escobar, who asked for forgiveness from his wife and mother for having failed them.

Thereafter, government counsel argued against any variation from the findings in the pre-sentence report. She pointed out there was evidence Escobar was an owner of a drug point, making him a manager or a leader of one of the points within the conspiracy. The government urged that Escobar "be sentenced according to the findings in the pre-sentence report . . . at a total offense level of forty-two, including a two level enhancement, which would put the defendant within the guidelines of three hundred and sixty months to life."

After hearing from counsel, the district court explained at some length why it was declining to grant the two-point leadership enhancement. The court noted that although the defendant was co-owner of the drug point with his brother, "he was acting more of [sic] a runner at the point . . . . It was more his brother, I think, who was . . . in active participation as the leader at that point than this defendant." The court went on to say there was no evidence of other individuals the brothers were supervising or over whom control was being exercised, and the court believed Escobar's brother had more "decision-making" authority. The court concluded, "So, really, for my recollection of the

evidence in this case, it would seem to me that he doesn't fall within the parameters of the commentary and that's why I'm not inclined to grant or go along with the probation officer's recommended enhancement for the two-level increase pursuant to guideline 3B1.1(c)."

After his above ruling denying the two-level increase, the court sentenced Escobar with the following explanation:

> On September 29, 2003, defendant Carlos Manuel Escobar Figueroa was found guilty by jury trial in Criminal Case 02-393, which charges a violation of Title 21, United States Codes, Section 846. Based on guideline 2D1.1C a base offense level of thirty or thirty-eight or thirty [sic] is determined as the offense or [sic] conviction involved more than one hundred and fifty kilograms of cocaine, that is having done the equivalency factors. Since the defendant had possession of a firearm within the conspiracy, a two level enhancement is warranted pursuant to guideline 2D1.1B. There are no other applicable guideline adjustments. Based on a total offense level of forty and a criminal history category of one, the guideline imprisonment range in this particular offense is from two hundred and ninety-two to three hundred and sixty-five months with a fine range of twenty-five thousand to four million dollars plus a supervised release term of at least five years. Therefore, it is the judgment of this court that the defendant is hereby committed to the custody of the Bureau of Prisons to be imprisoned for a term of two hundred and ninety-two months. Upon release from confinement you shall be placed on supervised release for a term of five years . . . .

## C. Post-Sentencing Proceedings

The above events end the story of Escobar's own sentencing. Judgment was entered on January 23, 2004. He filed a timely appeal to this court less than a week thereafter. Escobar's five co-defendants were, however, not sentenced at this time.

Instead, they were sentenced several months later, after which Escobar filed, unsuccessfully, towards the end of 2004 and the beginning of 2005, two new trial motions alleging that he had not been fairly sentenced. Underlying Escobar's complaint was an order the district court had issued on March 9, 2004, directing the government to "put the Court in a position to be able to individualize the amount of drugs attributable or foreseeable to each defendant based on the record and on the evidence presented during the trial," in keeping with the "new jurisprudence" in United States v. Colon-Solis, 354 F.3d 101 (1st Cir. 2004), a decision handed down two weeks before Escobar's January sentencing but apparently not yet known to the judge and Escobar's counsel at Escobar's sentencing.

The United States responded to the court's request on July 29, 2004, tendering information from the trial record bearing upon the different co-defendants' drug amounts. The government's response also included drug information about Escobar (even though he had already been sentenced), noting in particular Mendoza-Lebron's testimony of having furnished Escobar 1/8 of a kilogram of crack on a weekly basis over the period of their long relationship.

As noted, Escobar subsequently filed, on November 13, 2004 and February 7, 2005, two motions for new trial, citing to the First Circuit's holding in Colon-Solis and alleging error in the court's failure to have made an individualized finding as to the

drug amounts in his own case. The court denied both motions in electronic orders without comment. It is unclear whether the court rejected the motions on the merits or because they were untimely filed. See Fed. R. Crim. P. 35(a) (requiring a defendant to file any motion contesting his sentence within seven (7) days after sentencing). Though Escobar cited Fed. R. Crim. P. 33(b)(1), which provides a three-year window for a motion for a new trial on the basis of newly discovered evidence, the court's attention to Colon-Solis in the sentencing of the five co-defendants was scarcely newly discovered evidence. In any case, Escobar did not appeal to this court from the denial of his two post-sentence motions for a new trial, hence those motions are not now before us.

Unlike Escobar, who was sentenced prior to the court's March 9, 2004 order and prior to Booker, Escobar's co-defendants were all sentenced after the court's March 9, 2004 order and after the Supreme Court's decision in Booker. Although not part of the record of Escobar's proceedings, we note that Ofray was apparently sentenced to 200 months. Ofray's aide, Pedro Jose Diaz-Clavell, was sentenced to 151 months. Cruz-Pereira was sentenced to 216 months. Zaragoza-Lasa was sentenced to 300 months. A fifth co-defendant, Mizaury Lopez-Soto, was sentenced to 480 months. In all cases except that of Lopez-Soto, the court imposed sentences within the guideline range, based upon drug quantities found to be somewhat lower than Escobar's. In the case of Lopez-Soto, however,

-12-

the court went far above the guideline range because, it stated, the recommended guideline sentence did not reflect the seriousness of the offense.

**D.  Letters Filed Pursuant to Fed. R. App. P. 28(j)**

When it was disputed by counsel during appellate argument whether the district court had, in fact, made an individualized finding of drug quantity as to Escobar, the parties were directed to agree and notify us as to whether this was done, and if so, where such a finding could be found in the trial record.  Letters purporting to answer our inquiry have since been filed, expressly indicating the parties were unable to agree on the matter, but, for all practical purposes, underscoring what the sentencing transcript shows -- that no individualized drug quantity finding as such was made by the court.

**II.  Discussion**

**A.  Insufficient Evidence of Single Conspiracy**

Escobar argues there was insufficient evidence of a single drug conspiracy, as alleged in Count One, the sole count for which he was tried.  He says the evidence shows multiple conspiracies and failed, moreover, to show a direct connection between him and some of his co-defendants.  He also contends that there was insufficient evidence to demonstrate the accomplishment of a common goal or plan.

-13-

As a preliminary matter, the government responds that Escobar's multiple-conspiracy argument is insufficiently developed for us to take note of it and hence has been waived by Escobar. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived."). While the government may have some basis for this contention, we need not resolve it, as we find the multi-conspiracy argument to be without merit in any event.

Whether a single conspiracy exists is a question of fact for the jury. United States v. Portela, 167 F.3d 687, 696 (1st Cir. 1999); United States v. LiCausi, 167 F.3d 36, 45 (1st Cir. 1999). The jury's finding of a single conspiracy is subject to review for evidentiary sufficiency, United States v. David, 940 F.2d 722, 732 (1st Cir. 1991), and the evidence is taken in the light most favorable to the verdict, id. at 730.

A conspiracy constitutes an agreement to do an unlawful act. Ianelli v. United States, 420 U.S. 770, 777 (1975). A jury's finding of a single conspiracy will be supported if the evidence demonstrates that all of the alleged co-conspirators directed their efforts towards the accomplishment of a common goal or overall plan. United States v. Drougas, 748 F.2d 8, 17 (1st Cir. 1984). "[E]ach coconspirator need not know of or have contact with all other members, nor must they know all of the details of the

-14-

conspiracy or participate in every act in furtherance of it." United States v. Martinez-Medina, 279 F.3d 105, 113 (1st Cir. 2002). "The jury may infer an agreement circumstantially by evidence of, inter alia, a common purpose (such as a purpose to sell illicit drugs), overlap of participants, and interdependence of various elements in the overall plan." Id. at 113-14.

Here the conspiratorial unit was the Las Abispas organization headed by Cabezon, which trafficked in a variety of drugs. There was evidence it operated a number of drug points, especially in Guayama and Salinas. Cabezon, according to the evidence, rented out the drug points to Las Abispas members, who answered to him alone. Escobar and his brother operated the Miramar drug point, under the control of Cabezon and his Las Abispas organization. Escobar and/or his brother bought drugs from sources which also supplied other Las Abispas co-defendants. Escobar sold crack to co-defendant Cruz-Pereira, a Las Abispas member who operated another drug point for Las Abispas. Escobar stashed drugs and weapons for one of Las Abispas's suppliers, Mendoza-Lebron. There was ample evidence of Escobar's selling of crack at the Miramar drug point, including from and outside his own residence. The evidence is thus consistent with Escobar's participation in a single drug conspiracy defined by the Las Abispas organization to which he belonged.

It is immaterial there was no proof of a direct connection between Escobar and every one of his co-defendants standing trial. A single conspiracy can exist even where there is no personal contact among some of the individual participants; the fact that every defendant did not participate in every transaction necessary to fulfill the common aim does not transform a single ongoing scheme into multiple conspiracies. United States v. Vega-Figueroa, 234 F.3d 744, 753 (1st Cir. 2000) (citation omitted). Moreover, "[t]he government need not show that every person indicted was a member of the conspiracy." Martinez-Medina, 279 F.3d at 113. The evidence presented here would have allowed a reasonable jury to conclude, as it did, that Escobar was involved in a single illegal enterprise having as its common purpose the selling of illegal drugs.

We find no merit in the multiple conspiracy contention.

## B. Sentencing Considerations

Escobar argues that the district court erred at sentencing when it failed sua sponte to provide a two-level downward adjustment for his allegedly minor role in the offense pursuant to USSG § 3B1.2; added a two-level enhancement for possession of a firearm pursuant to USSG § 2D1.1(b)(1); and failed to make an individualized finding of a specific drug quantity. Finally, Escobar argues that, under Booker, his sentence should be

vacated and his case remanded for resentencing under the newly advisory sentencing guidelines.

### i. Minor Participant

Escobar argues that, under the sentencing guidelines, the court should, on its own, have afforded him a two-level downward adjustment, as he was a "minor participant in any criminal activity." USSG § 3B1.2(b). Escobar, however, never asserted he was entitled to this downward adjustment at the sentencing hearing, even though his counsel was invited by the court to offer corrections and objections to the pre-sentence calculations in the PSI, which recommended a guidelines sentence that did not include this adjustment. Instead, on two occasions, Escobar's counsel affirmatively expressed satisfaction with the PSI. The district court sentenced Escobar in accordance with the PSI's sentencing calculations, omitting only the PSI's recommended two-level leadership enhancement, and Escobar at no time mentioned or took exception to omission of the minor participant downward adjustment. He waived, therefore, the right to insist upon receiving this benefit. See United States v. Morales-Madera, 352 F.3d 1, 14 (1st Cir. 2003) (defendant did not argue for adjustment at sentencing and did not object to its omission from the PSR, hence the argument was abandoned).

Even assuming arguendo that failure to raise the claim were a forfeiture, not a waiver, it would still fail on plain error

review. "A defendant has the burden of proving he merits a downward departure adjustment in the offense level." United States v. Ortiz, 966 F.2d 707, 717 (1st Cir. 1992) "The test is even more demanding on plain error review; the defendant must show, in effect, that the status for which he argues is 'the only one rationally supported by the record below.'" United States v. Martinez-Vargas, 321 F.3d 245, 250 (1st Cir. 2003) (citation omitted). Escobar contends that his "conduct was one of a street pusher for Splenda bag size crack." The evidence shows, however, that for a lengthy period he was also the co-owner of a drug point. He purchased and prepared drugs for resale, supplied drugs to other co-conspirators and decided the price scheme for the sale of drugs. He then kept the proceeds from the transactions. Thus it was scarcely error, let alone plain error, for the court not to give a downward adjustment on "minor participant" grounds.

### ii. Weapons Enhancement

The court followed the recommendation of the PSI by adding two points to Escobar's offense level under USSG § 2D1.1(b)(1), which provides that the sentencing judge can increase the offense level by two levels "[i]f a dangerous weapon (including a firearm) was possessed." Again, Escobar failed to object to this enhancement either after sentence was pronounced or, earlier, when expressly invited by the district court to offer any corrections and objections to the PSI. His attorney objected to the two-point

supervisory role enhancement but not to the weapons enhancement. Indeed, as already mentioned, the attorney said on two occasions that the objected-to supervisory enhancement was the only item in the PSI he took exception to. Escobar therefore cannot raise the issue on appeal. See United States v. Benjamin, 30 F.3d 196, 197 (1st Cir. 1996) (sentencing challenge should not be addressed for the first time on appeal). And supposing arguendo the issue were open on appeal, we would review only for plain error. Id. There was, however, adequate evidence to allow the court to impose the weapons enhancement without committing error, plain or otherwise. "The comment to this section states that the enhancement applies if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense." United States v. Nelson-Rodriguez, 319 F.3d 12, 58 (1st Cir. 2003). Escobar denies there is evidence in the record that he actually or constructively possessed a firearm. The government, however, points to evidence that Escobar concealed weapons for a co-conspirator and possessed a firearm as part of his drug trafficking activities. Cooperating witness Mendoza-Lebron testified that Escobar concealed weapons and drugs for him between approximately 1994 and 1999. He testified that when someone had shot at Escobar's brother, Escobar and his brother both possessed weapons of their own. Thus we reject Escobar's assertion that the weapons enhancement was improperly added in computing his sentence.

### iii. Drug Quantity

Escobar argues that the district court erred by not making an individualized finding as to drug amounts attributable to or foreseeable by himself in keeping with Colon-Solis. Instead, the court, without explanation of its own or in the PSI, imposed a guidelines sentence calculated on a drug amount of 150 kilograms of cocaine. The PSI, inaccurately it would seem, had described this as the drug with which Escobar was involved; the court, when sentencing Escobar, said without explanation that the "offense or [sic] conviction involved more than one hundred and fifty kilograms of cocaine, that is having done the equivalency factors." One hundred and fifty kilograms of cocaine is more than the minimum amount (five or more kilograms) charged in the indictment and found by the jury. While the "or more" wording of the indictment would make it perfectly permissible to conclude on the basis of competent evidence that Escobar or his co-defendants were dealing with more cocaine than the alleged minimum, no evidence of cocaine-dealing by Escobar in the amount of 150 kilograms has been brought to our attention. The trial evidence as to Escobar's drug involvement related almost exclusively to crack, not cocaine. However, the evidence of record easily supports a finding that Escobar's crack dealings involved amounts of crack well in excess of that needed to reach the 38 base offense level called for by 150 kilograms of cocaine. See supra note 1.

-20-

Colon-Solis, a case this Circuit handed down on January 8, 2004, two weeks prior to Escobar's sentencing hearing, stands for the proposition that even when a defendant admits that the conspiracy to which he belonged handled drug quantities sufficient to trigger a statutory mandatory minimum sentence, he is not automatically subject to that mandatory minimum without a further finding that the triggering amounts were specifically attributable to, or foreseeable by, him. 354 F.3d at 103-04.[3] In Colon-Solis, the defendant entered a straight guilty plea to a conspiracy involving more than five kilograms of cocaine. At sentencing, the district court found that Colon-Solis was responsible for five or more kilograms of cocaine, based solely on his plea to the conspiracy charge, even though the defendant sought to show that he was not personally on notice of or connected with such large amounts. This court found that the district court was in error, without further inquiry, automatically to attribute the full amount of drugs attributed to the conspiracy to the defendant and vacated the sentence. Id. at 103.

As with his other two sentencing objections, Escobar has arguably waived his present Colon-Solis argument, his counsel

---

[3]We have since indicated that the same drug quantity analysis prescribed in Colon-Solis is applicable for guidelines sentencing purposes, not just for the purpose of ascertaining application of mandatory minimums. See United States v. Pizarro-Berrios, 448 F.3d 1, 4 (1st Cir. 2006); United States v. Rodriguez-Gonzalez, 433 F.3d 165, 168 (1st Cir. 2005).

having affirmatively stated to the district court at the sentencing hearing, on two occasions, that (apart from the two-level leadership enhancement) he found nothing to correct in, and had no objection to, the PSI, which, in its calculation of the proposed guidelines sentence, adopted 38 as the base offense level, based upon the supposition that Escobar had been convicted of involvement with 150 kilograms of cocaine. The court then announced a sentence adopting the PSI's premises (i.e., 150 kilograms of cocaine) and calculations (except for the two-level leadership enhancement), and nothing further was ever said by or for Escobar to dispute those calculations. United States v. Vega, 398 F.3d 149, 152 (1st Cir. 2005).

But even were we to review Escobar's Colon-Solis claim on appeal, it would be unavailing. As the district court subsequently recognized when sentencing the co-defendants, an individualized drug quantity finding should be made for each defendant, but, in the absence of an objection to the omission of such a finding, a reversal is warranted only if the preconditions for a finding of plain error exist.[4] We must ask if the errors that occurred

_____

[4]The use in the PSI of 150 kilograms of cocaine, coupled with a total absence of any explanation of where that amount came from and how it related to Escobar, reflects poorly on the PSI. Regardless of awareness of Colon-Solis, the PSI should have contained a reasonably detailed narrative as to Escobar's drug involvement instead of just a generalized discussion of the conspiracy as a whole that made no mention of specific drug quantities at all. See Fed. R. Crim. P. 32(c)(2) ("The presentence report shall contain . . . a statement of the circumstances of the

-22-

affected Escobar's substantial rights and if they constituted a miscarriage of justice.  <u>United States</u> v. <u>Olano</u>, 507 U.S. 725, 736 (1993).  On the specific facts presented here, we think not.

The trial testimony of Mendoza-Lebron that Escobar was involved in the sale of 1/8 kilogram of crack on a weekly basis between 1994 and 1999 provides evidence of a quantity of crack considerably more than sufficient to justify a base offense level of 38. <u>See</u> <u>supra</u> note 1.  And there is no alternative evidence in Escobar's case plausibly suggesting a lesser drug amount.  Escobar disputes Mendoza-Lebron's testimony but does not point to any part of the record where we may find evidence contradicting it.[5]

_____

offense and circumstances affecting the defendant's behavior").

[5]In a January 31, 2006 letter written in response to the government's 28j letter, Escobar's counsel asked us to review Mendoza-Lebron's testimony and stated "[t]he Defendant-Appellant respectfully submits that the trial testimony of co-conspirator, confidential witness Abdul Mendoza-Lebron cannot be construed as he [sic] having testified that 'defendant sold 1/8 kilograms of crack on a weekly basis between 1994 and 1999 at the drug point.'"  But while Mendoza-Lebron professed uncertainty about whether his drug dealing relationship with the Escobar brothers began in 1994 or 1995, he stated unequivocally in his testimony that it began at least by 1995:

> Q: You have stated that you started dealing with drugs in 1994?
> A: Yes.
> Q: And you also stated that Carlos M. Escobar started with you that year also?
> A: He started, he would deal when I started supplying to him.
> Q: In 1994?
> A: That I know of, the ones dealing were he and his brother.  I can't say whether it was in '94 or '95.

Escobar argues that the lower sentences given subsequently to his co-defendants after the court requested the government to provide individualized information as to each demonstrates a fundamental unfairness in his own sentence. But we have read the transcripts of the district court's later sentencings of Escobar's co-defendants and find that, in their cases, the court based the offense level on the individualized evidence of drug type and quantity furnished by the various government witnesses at trial -- a process which, had it been expressly applied to Escobar, would almost surely have resulted in the very same sentence he received. Indeed, it seems likely the court and Escobar's counsel did rely upon their knowledge of the evidence of Escobar's extensive crack dealing, given the judge's reference in sentencing to having done the equivalency factors. See supra note 1. It is true that Ofray, the main cocaine supplier from the Guayama area, was sentenced to only 200 months based on an offense level of 34, plus two points for weapons possession, but Ofray's lower figure was based on the

Trial Transcript, August 13, 2003, p. 635, cross-examination of Mendoza-Lebron. Mendoza-Lebron testified that, "on a weekly basis we would sell about an eighth [of crack] out of that drug point." He said, "I sold Jovanni [Escobar's brother] an eighth. I would give one to Carly [Escobar] and then they would sell to me, and they would sell me one at the drug point . . . . I would give Jovanni an eighth, an eighth to Carly and an eighth that was mine." Thus it could be inferred that Escobar was involved in weekly sales over at least a four-year period, adding up, literally, to over 200 such sales. Yet even if Mendoza-Lebron's sales of 1/8 kilograms of crack weekly to Escobar had occurred only 12 times between the period 1994/5-1999, the total amount of that drug attributable to Escobar would afford a base offense level of 38.

fact that, while he dealt in both cocaine and crack, the court elected to base its calculations on the former drug, acknowledging that it was being conservative. While the testimony of the frequency of Mendoza-Lebron's cocaine transactions with Ofray was similar to his crack transactions with Escobar, the difference in drug type between cocaine and crack resulted in a lesser offense level. The court, to be sure, might have arrived at a greater offense level by adding in Ofray's additional drug dealings, but it consciously elected not to do so. No such choice as between different drugs existed in Escobar's case.

Thus, had the court made an individualized assessment based on the government's drug quantity information later furnished for Escobar, his offense level, based on his almost exclusively crack dealings, would almost certainly have been no less than 38, the same as it was. In the information subsequently furnished in response to the district court's March 9, 2004 order (issued after Escobar's sentence and judgment on January 23, 2004), the government made reference to the trial evidence relative to Escobar, as well as to his unsentenced colleagues, stating that, according to Mendoza-Lebron's testimony, 1/8 kilogram of crack had been sold weekly to Escobar by Mendoza-Lebron and implicating a period of time that appears to have been at least four years. As we have already noted, it would have taken no more than 12 such weekly sales to reach 1.5 kilograms of crack, a drug quantity

calling for a base offense level of 38, the level the court used in sentencing Escobar. Hence, even if the district court had expressly followed the Colon-Solis requirement, it is hard to see any ready basis for Escobar to be assigned a lesser offense level than that adopted. We can see little reason, therefore, to believe that the errors at Escobar's sentencing affected his substantial rights or, more to the point, constituted a miscarriage of justice. The evidence of drug quantity appearing in the record as directly attributable to Escobar made it highly unlikely that a lower offense level would have resulted from an individualized finding of the amount of crack attributable to, or foreseeable by, Escobar. Vega, 398 F.3d at 152. Accordingly, we do not find plain error.

### iv. Booker

Finally we turn to the question of Booker remand. Escobar argues that there is a reasonable probability that the district court would impose a lesser sentence on remand. He claims that because of the lesser sentences given post-Booker to some of his co-defendants, there is a reasonable probability that he too would get a lower sentence on remand, particularly because he was a first offender who was in his teens at the time, at least, of the very beginning of the conspiracy. Because Escobar did not preserve a Booker argument at the district level, we review for plain

error.[6]  The first two prongs of the plain error standard are satisfied whenever, as here, a defendant's sentence was imposed by reference to a mandatory system of federal sentencing guidelines. United States v. Antonakopoulos, 399 F.3d 68, 77 (1st Cir. 2005). To meet the third prong of the plain error test, "ordinarily the defendant must point to circumstances creating a reasonable probability that the district court would impose a different sentence more favorable to the defendant under the new 'advisory Guidelines' Booker regime." Id. at 75.  A defendant cannot satisfy the third prong by a "mere assertion that the court might have given [him] a more favorable sentence." Id. at 80.  A defendant must show, "either in the existing record or by plausible proffer," that "there is a reasonable indication that the district judge might well have reached a different result under advisory guidelines." United States v. Heldeman, 402 F.3d 220, 224 (1st Cir. 2005).  If a district court made statements suggesting that it would have been inclined to impose a lesser sentence but was restricted by the mandatory guidelines, that indicates a reasonable

---

[6]We note that Escobar, while acknowledging the appropriate standard of review, also makes a glancing argument that he may have preserved a Booker-type error by requesting downward departure for his age and objecting to the role in the offense increase recommended in the PSI.  In order to preserve a Booker error, however, he would have had to argue an error under Apprendi v. New Jersey, 530 U.S. 466 (2000), or Blakely v. Washington, 542 U.S. 296 (2004), or that the Guidelines were unconstitutional.  United States v. Antonakopoulos, 399 F.3d 68, 76 (1st Cir. 2005).  Escobar did not do so here.

probability that the defendant's sentence was affected by a <u>Booker</u> error. <u>Antonakopoulos</u>, 399 F.3d at 81; <u>Heldeman</u>, 402 F.3d at 224.

Though the district court sentenced Escobar at the low end of the guideline range, that alone is not indicative of a reasonable probability that the court would give a different sentence on remand. <u>United States</u> v. <u>Kornegay</u>, 410 F.3d 89, 99-100 (1st Cir. 2005) (the fact that the court sentences a defendant "to the low end of the applicable Guideline range is not, by itself, sufficient to show a reasonable probability of a lesser sentence under the advisory system"). Prior to sentencing, the district court had a chance to rule on Escobar's motion for downward departure under USSG §§ 5H1.1 (age) and 5K2.0 (general departure) but denied that request. It made no mention at the sentencing hearing of feeling constrained by the guidelines from administering a lower sentence. The court likewise did not suggest that it felt the guidelines sentence was too harsh. Further, when given the chance to sentence Escobar's co-defendants under the newly advisory guidelines, the district court did not sentence below the guideline range for any of them and in fact gave one co-defendant a much higher sentence than the guideline range, thus suggesting that the district court was not inclined to give any of the defendants lower sentences under the new <u>Booker</u> regime.

To the extent that Escobar argues that the disparity between his sentence and those of his subsequently sentenced co-

-28-

defendants is unwarranted under 18 U.S.C. § 3553(a)(6),[7] we note that each of the defendants was sentenced on the basis of findings of drug quantity which varied from defendant to defendant. Each defendant was thus not identically situated such that disparity among their sentences could be considered unwarranted. Without indicia that the district court, freed from absolute guideline constraints, was likely to have imposed a lesser sentence, we can see no reason to remand. **Affirmed**.

---

[7]We question whether Escobar has successfully raised this argument as he discusses the issue of disparity directly only in his reply brief. See United States v. Torres, 162 F.3d 6, 11 (1st Cir. 1998) (party may not raise an argument for the first time in a reply brief).